IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.   1:19-cr-00089 |
| Plaintiff, | **PLEA AGREEMENT** |
| v. | |
| HUNTER BRIAN HANSON, | |
| Defendant. | |

Pursuant to Rule 11(c)(1)(A) and (B) of the Federal Rules of Criminal Procedure, the United States of America, by its attorneys, Drew H. Wrigley, United States Attorney for the District of North Dakota, and Jonathan J. O'Konek, Assistant United States Attorney; defendant, HUNTER BRIAN HANSON; and defendant's counsel, Lucas Wynne, agree to the following:

1.      Defendant acknowledges the Information charges violations of 18 U.S.C. §§ 1343, 1956(a)(1)(B)(i), 982(a)(1), 982(b)(1), and 2, and 28 U.S.C. §§ 853(p) and 2461(c).

2.      Defendant has read the Charges and defendant's attorney has fully explained the Charges to defendant.

3.      Defendant fully understands the nature and elements of the charged crimes.

4.      Defendant will voluntarily plead guilty to Counts One and Two of the Information (Wire Fraud and Money Laundering) and will admit to the forfeiture allegation.  Additionally, defendant will, pursuant to Federal Rule of Criminal Procedure

7(b), waive prosecution by Indictment and will voluntarily plead guilty to the Counts

contained within the Information.

5.      The parties agree this Plea Agreement shall be filed as part of the Court

record and be governed by Federal Rule of Criminal Procedure 11(c).  The parties

specifically agree that Rule 11(c)(1)(C) does not apply.  If the United States makes the

non-binding recommendations specified in this Plea Agreement, then defendant

acknowledges that this agreement will have been fulfilled.  Except as provided in

Rule 11(c)(5), the Court's refusal to accept any or all terms of the Plea Agreement does

not give defendant a right to withdraw defendant's guilty plea.

6.      Defendant will plead guilty because defendant is in fact guilty of the

Charges.  In pleading guilty to Counts One and Two, defendant acknowledges that:

> **(a)  Count One:  Wire Fraud**.  Between on or about January 2018 through
> on or about December 2018, in the District of North Dakota and elsewhere,
> HUNTER BRIAN HANSON, individually and by aiding and abetting, with
> intent to defraud, did voluntarily and intentionally devise and intend to
> devise a scheme and artifice to defraud and to obtain money and property
> by means of materially false and fraudulent pretenses, representations, and
> promises, knowing the pretenses, representations, and promises were false
> and fraudulent when made, and did transmit and cause to be transmitted, by
> means of wire communications in interstate and foreign commerce, certain
> writings, signs, signals, pictures, and sounds;
>
> HUNTER BRIAN HANSON, used wire communications, in the form of email
> communications, to lull farmers and elevators into a false sense of security, to
> postpone inquiries, or to make his transactions between the farmers and elevators
> less suspect.  Specifically, on October 25, 2018, an employee with Shafer
> Commodities, Inc., located in Morden, Manitoba, Canada, sent an email to
> HUNTER BRIAN HANSON stating that it had not received a wire transfer for
> agricultural commodities payment.  Thereafter, HUNTER BRIAN HANSON sent
> an email to Shafer Commodities, Inc. stating that his bank informed him that he
> had the wrong account number and that he would send the wire transfer as soon as

2

possible.  However, this statement by HUNTER BRIAN HANSON was false and HUNTER BRIAN HANSON knew it to be false when he sent this email to Shafer Commodities, Inc.  Additionally, HUNTER BRIAN HANSON did not send a wire transfer or check to Shafer Commodities, Inc. for this agricultural commodities purchase;

In violation of Title 18, United States Code, Sections 1343 and 2.

**(b)  Count Two:  Money Laundering**.  From on or about January 2018 to on or about December 2018, in the District of North Dakota, and elsewhere, HUNTER BRIAN HANSON, did, individually and by aiding and abetting, knowingly and willfully conduct and attempt to conduct financial transactions affecting interstate commerce, which involved the proceeds of specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity, and that, while conducting and attempting to conduct such financial transactions, HUNTER BRIAN HANSON knew the property involved in the financial transaction represented the proceeds of some form of unlawful activity;

In violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

**(c)  Factual Background**:

I.      HUNTER BRIAN HANSON is the owner of Midwest Grain Trading, located in Devils Lake, North Dakota, which operated as a North Dakota roving grain buyer.  HUNTER BRIAN HANSON is also the owner of NoDak Grain, located in Rugby, North Dakota, which operated licensed grain warehouses at Tunbridge and Rohrville, North Dakota.   Between approximately January 2018 and December 2018, prior to the period when the North Dakota Public Service Commission (PSC) applied to become trustee of these entities, in the District of North Dakota and elsewhere, HUNTER BRIAN HANSON operated and executed a scheme to defraud approximately sixty (60) farmers, elevators, or brokers in North Dakota, Minnesota, and Canada.  As a result, these approximately sixty (60) farmers, elevators, or brokers suffered a total financial loss of approximately $11,405,134.72.  Listed below are the names of the farmers, elevators, or brokers through whom HUNTER BRIAN HANSON defrauded:

3





II.      In November 2018, the PSC received multiple complaints from farmers and
         elevators stating that they had sold agricultural commodities to HUNTER
         BRIAN HANSON, d/b/a Midwest Grain Trading, were promised payment,
         but that HUNTER BRIAN HANSON never paid them for these
         commodities.  Thereafter, the PSC moved the South Central Judicial Court
         located in Bismarck, North Dakota, to secure trustee appointment of
         HUNTER BRIAN HANSON's businesses and the court approved the
         PSC's trustee request.

III.     HUNTER BRIAN HANSON operated and executed this scheme to defraud
         by contracting with multiple farmers and grain elevators to obtain grain or
         other agricultural commodities, obtained these commodities, and either
         failed to pay the farmers and elevators for these commodities or sent these
         farmers and elevators non-sufficient funds checks.  For example, on
         October 26, 2018, in Mountrail County, North Dakota, defendant Hunter
         Hanson, d/b/a Midwest Grain Trading, issued a $94,480.41 check to United
         Quality Cooperative.  United Quality Cooperative deposited this check into
         their bank account and it was returned unpaid due to Nonsufficient Funds.
         The total amount owed to United Quality Cooperative for grain picked up
         by Midwest Grain Trading is $347,939.75.  During the months of October

and November 2018, after having previously obtained agricultural commodities from farmers and elevators, HUNTER BRIAN HANSON, sent numerous non-sufficient funds checks to farmers and elevators with whom he had contracted with to obtain these commodities.

IV.   Additionally, as part of the scheme to defraud, HUNTER BRIAN HANSON, through his companies, maintained multiple bank accounts, engaged in check kiting to cover his deposits and withdrawals, laundered money between his bank accounts and other businesses, and often did not have sufficient funds in his bank accounts when he remitted payments to farmers and elevators for money owed on the agricultural commodities purchasing contracts. The following is an example of the fraudulent banking activity conducted by HUNTER BRIAN HANSON: In 2018, HUNTER BRIAN HANSON had eleven identified bank accounts associated with his businesses. Four of the bank accounts included bank accounts for Midwest Grain Trading, Midwest Hauling and Transport, NoDak Grain and Hanson Motors. On November 5, 2018, HUNTER BRIAN HANSON conducted an online banking transfer of $137,000 dollars from his Midwest Grain Trading account to his Midwest Hauling and Transport account. HUNTER BRIAN HANSON then wrote a check for $137,000 dollars from his Midwest Hauling and Transport account and deposited the check in his Hanson Motors account. HUNTER BRIAN HANSON listed October 5, 2018 as the date on the $137,000 check; however, the date stamp on the back of the check stated November 5, 2018. The $137,000 dollar check was returned on November 19, 2018 for Nonsufficient Funds. The balance of the Hanson Motors bank account, prior to depositing the $137,000 dollar check, was $10,848.26. After depositing the $137,000 dollar check, on November 5, 2018, HUNTER BRIAN HANSON sent a wire transfer for $39,725.00. On November 2, 2018, HUNTER BRIAN HANSON used the $137,000 dollar deposit to cover a check written on the Hanson Motors account for $98,525.00 dollars. The date on the front of the check was written as October 2, 2018; however, the check was date stamped November 2, 2018 on the reverse of the check. Bank records indicate HUNTER BRIAN HANSON was in Las Vegas, Nevada on November 2, 2018 and was in North Dakota on October 2, 2018. HUNTER BRIAN HANSON used the $137,000 dollar deposit to cover the Hanson Motors account from November 5, 2018 through November 13, 2018. On November 13, 2018, the balance on the Hanson Motors account was reduced to $4,109.78 when HUNTER BRIAN HANSON deposited another check from a NoDak Grain bank account in the amount of $140,000 dollars. The $140,000 dollar check was written on a closed NoDak Grain account (closed on November 9, 2018) and deposited in the Hanson Motors account on November 10, 2018. On

6

November 9, 2018, the NoDak Grain account was closed by the bank
"DUE TO FREQUENT LARGE OD BALANCES." The bank also closed
the Midwest Grain Trading, Midwest Hauling &Transport and Hanson
Motors accounts on November 13, 2018, "DUE TO FREQUENT LARGE
OD BALANCES." At the time the $140,000 dollar check was deposited,
HUNTER BRIAN HANSON had two bank accounts for Hanson Motors at
two different banks. The Hanson Motors account that was closed on
November 13, 2018 was a different Hanson Motors account than the
account where the $140,000 dollar check was deposited.

V.    Moreover, as part of the scheme to defraud, HUNTER BRIAN HANSON
      diverted funds from his grain business accounts to other personal and
      business accounts. For example, on November 13, 2018, HUNTER
      BRIAN HANSON received a closing withdrawal from one of his Midwest
      Grain Trading bank accounts in the amount of $168,311.66. This Midwest
      Grain Trading bank account had received multiple deposits from local grain
      elevators stemming from the purchase of grain by the elevators. The next
      day, November 14, 2018, HUNTER BRIAN HANSON had $168,311.66
      deposited into a Hanson Motors bank account. Hanson Motors is a car
      dealership in Belcourt, North Dakota, in which HUNTER BRIAN
      HANSON has a financial interest. This deposit of funds into Hanson
      Motors came at a time when numerous farmers, brokers and elevator
      operators were seeking payment from HUNTER BRIAN HANSON.

VI.   Further, as part of the scheme to defraud, HUNTER BRIAN HANSON
      purchased agricultural commodities from farmers and elevators above their
      per bushel market value and then sold these same commodities below their
      per bushel market value. For example, from transactions between
      McClusky Coop Elevator and Osnabrock Farmers Coop Elevator
      Company, between August and September 2018, HUNTER BRIAN
      HANSON lost more than $131,125.72 by purchasing agricultural
      commodities above their per bushel market value and selling these
      commodities below their per bushel market value.

VII.  Finally, as part of the scheme to defraud, HUNTER BRIAN HANSON,
      used wire communications, in the form of email communications, to lull
      farmers, elevators, or brokers into a false sense of security, to postpone
      inquiries, or to make his transactions between the farmers, elevators, or
      brokers less suspect. For example, on October 25, 2018, an employee with
      Shafer Commodities, Inc., located in Morden, Manitoba, Canada, sent an
      email to HUNTER BRIAN HANSON stating that it had not received a wire
      transfer for agricultural commodities payment. Thereafter, HUNTER
      BRIAN HANSON sent an email to Shafer Commodities, Inc. stating that

his bank informed him that he had the wrong account number and that he would send the wire transfer as soon as possible. However, this statement by HUNTER BRIAN HANSON was false and HUNTER BRIAN HANSON knew it to be false when he sent this email to Shafer Commodities, Inc. On October 25, 2018, HUNTER BRIAN HANSON, d/b/a Midwest Grain Trading, owed Shafer Commodities, Inc. $77,300.17 for purchased and delivered agricultural commodities. On October 25, 2018, bank records for HUNTER BRIAN HANSON, d/b/a Midwest Grain Trading, showed a balance of $94,243.47. Additionally, on October 26, 2018, bank records showed that HUNTER BRIAN HANSON, d/b/a Midwest Grain Trading, wrote checks totaling $587,637.22 dollars. On November 1, 2018, HUNTER BRIAN HANSON, d/b/a Midwest Grain Trading, had a bank account balance of negative (-) $460,766.43. HUNTER BRIAN HANSON did not send a wire transfer or check to Shafer Commodities, Inc. for this agricultural commodities purchase. In total, HUNTER BRIAN HANSON, d/b/a Midwest Grain Trading did not pay Shafer Commodities, Inc. $167,418.66 for delivered agricultural commodities.

7.   Defendant understands the following maximum penalties apply:

Count One

| | |
|---|---|
| Imprisonment: | 20 years |
| Fine: | $250,000 |
| Supervised Release: | 3 years |
| Special Assessment: | $100 |

Count Two

| | |
|---|---|
| Imprisonment: | 20 years |
| Fine: | $500,000 (or twice the value of the laundered property, whichever is greater) |
| Supervised Release: | 3 years |
| Special Assessment: | $100 |

Defendant agrees to pay the Clerk of United States District Court the special assessment on or before the day of sentencing.

8

8.     Defendant understands that by pleading guilty defendant surrenders rights, including:

(a)     The right to a speedy public jury trial and related rights as follow:

(i)     A jury would be composed of twelve (12) lay persons selected at random. Defendant and defendant's attorney would help choose the jurors by removing prospective jurors "for cause," where actual bias or other disqualification is shown; or by removing jurors without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict. The jury would be instructed that defendant is presumed innocent and that it could not return a guilty verdict unless it found defendant guilty beyond a reasonable doubt.

(ii)     If a trial were held without a jury, then the Judge would find the facts and determine whether defendant was guilty beyond a reasonable doubt.

(iii)     At a trial, whether by a jury or Judge, the United States is required to present witness testimony and other evidence against defendant. Defendant's attorney can confront and examine them. In turn, the defense can present witness testimony and other evidence. If witnesses for defendant refuse to appear voluntarily, defendant can require their attendance through the subpoena power of the Court.

(iv)     At trial, defendant has a privilege against self-incrimination; thus, defendant can decline to testify. No inference of guilt can be drawn

9

from defendant's refusal to testify.  Defendant can choose to testify, but cannot be required to testify.

(b)     Defendant has a right to remain silent.  However, under terms of the Plea Agreement, the Judge will likely ask defendant questions about defendant's criminal conduct to ensure that there is a factual basis for defendant's plea.

9.     Defendant understands that by pleading guilty defendant is giving up all of the rights set forth in the prior paragraph, and there will be no trial.  Defendant's attorney has explained those rights, and consequences of defendant's waiver.

10.     The Court shall impose a sentence sufficient to comply with purposes set forth in the Sentencing Reform Act.  In doing so, the Court shall consider factors set forth in 18 U.S.C. § 3553(a), and must consult and take into account the United States' Sentencing Commission, Guidelines Manual, (Nov. 2018) (USSG).  Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation and Pretrial Services Office of the nature, scope, and extent of defendant's conduct, including all matters in aggravation and mitigation relevant to the issue of sentencing.  The United States expressly reserves the right to appeal from an unreasonable sentence.

11.     This Plea Agreement is binding only upon the United States Attorney for the District of North Dakota.  It does not bind any United States Attorney outside the District of North Dakota, nor does it bind any state or local prosecutor.  They remain free to prosecute defendant for any offenses under their jurisdiction.  This Plea Agreement also does not bar or compromise any civil or administrative claim.

10

12.     Defendant understands the United States Attorney reserves the right to notify any local, state, or federal agency by whom defendant is licensed, or with whom defendant does business, of defendant's conviction.

13.     The parties agree that the base offense level under the Sentencing Guidelines for defendant's conduct is 7.  (USSG § 2B1.1(a)(1)).

14.     The parties agree that the following upward adjustments are applicable in this case:

- +20.  Loss of more than $9,500,000.  (USSG § 2B1.1(b)(1)(K)).

- +2.  Offense involved 10 or more victims.  (USSG § 2B1.1(b)(2)(A)).

- +2.  Conviction under 18 U.S.C. § 1956.  (USSG § 2S1.1(b)(2)(b)).

15.     The parties agree that the following downward adjustments are applicable in this case:

- None other than acceptance of responsibility as noted below.

16.     At sentencing, United States agrees to recommend a 2-level downward adjustment for acceptance of responsibility, provided defendant has demonstrated a genuine acceptance of responsibility.  (USSG § 3E1.1(a)). The United States further agrees to move for an additional 1-level downward adjustment for timely notifying the United States of defendant's intention to enter a guilty plea, thus permitting the Court and the United States to allocate their resources efficiently.  (USSG § 3E1.1(b)).

17.     Neither the Court nor the Probation Office is a party to the Plea Agreement. Neither the Court nor the Probation Office is bound by the Plea Agreement as to determining the Sentencing Guideline range.  The Court may depart from the applicable

11

guidelines range if the Court, on the record, states factors not contemplated by the

Sentencing Guidelines' Commission to justify the departure.  Both parties reserve the

right to object to any departure.  See USSG § 1B1.1, comment. (n.1) (defines

"departure").  There may be other adjustments the parties have not agreed upon.

### 18(a).  At sentencing, the United States will:

> (a)    Recommend a sentence within the applicable Guideline range and
> recommend that the sentences on Counts One and Two run concurrent with one
> another;

> (b)    Recommend that defendant be ordered to serve a three year period of
> supervised release to run concurrent on Counts One and Two;

> (c)    Recommend that defendant pay the $200 in special assessments; and

> (d)    Agree to not charge defendant with any additional federal economic
> crimes related to his scheme to defraud, which occurred prior to the date the
> defendant signs this plea agreement.  Specifically, the United States agrees not to
> charge the defendant with any additional mail fraud, wire fraud, bank fraud,
> money laundering, or transportation of stolen goods charges related to his scheme
> to defraud.

### 18(b).  At sentencing, defendant:

> (a)  Agrees to pay full restitution in the amount of $11,405,134.72.  The
> United States does not object to defendant paying this restitution amount in
> installments as approved by the court.

> (b)  Is permitted to request that the Court impose any lawful sentence.

19.     Defendant acknowledges and understands that if defendant violates any term of this Plea Agreement, engages in any further criminal activity, or fails to appear for sentencing, the United States will be released from its commitments.  In that event, this Plea Agreement shall become null and void at the discretion of the United States, and defendant will face the following consequences:  (1) all testimony and other information defendant has provided at any time to attorneys, employees, or law enforcement officers of the government, to the Court, or to the Federal Grand Jury, may be used against defendant in any prosecution or proceeding; and (2) the United States will be entitled to reinstate previously dismissed charges and/or pursue additional charges against defendant and to use any information obtained directly or indirectly from defendant in those additional prosecutions.  Nothing in this agreement prevents the United States from prosecuting defendant for perjury, false statement(s), or false declaration(s), if defendant commits such acts in connection with this agreement or otherwise.

20.     Defendant acknowledges the provisions of Title 18, United States Code, Sections 2259 and 3663A, which require the Court to order restitution.  Defendant agrees to pay restitution as may be ordered by the Court.  Defendant acknowledges and agrees that the Court will order defendant to make restitution for all loss caused by defendant's conduct, regardless of whether counts of the Indictment or Information will be dismissed as part of this Plea Agreement.  Defendant further agrees to grant the United States a wage assignment, liquidate assets, or complete any other tasks the Court finds reasonable and appropriate for the prompt payment of any restitution or fine ordered by the Court.

13

21.    The United States will file a Supplement in this case, as is routinely done in every case, even though there may or may not be any additional terms. Defendant and defendant's attorney acknowledge that no threats, promises, or representations exist beyond the terms of this Plea Agreement.

22.    **Defendant's Waiver of Appeal**. Defendants have a right to appeal their conviction and sentence (Judgment), unless they agree otherwise. Appeals are taken to the United States Court of Appeals for the Eighth Circuit (appellate court), pursuant to Title 18, United States Code, Section 3742(a). The appellate court has ruled that defendants can waive (give up) their right to appeal. Defendants often waive their right to appeal as part of a plea agreement and in exchange for concessions by the United States. The appellate court will enforce such waivers.

Defendant and defendant's attorney acknowledge they have fully reviewed and fully discussed the record in this case and all issues that may be raised on appeal. They have fully discussed defendant's right of appeal and the consequences of waiver. Defendant has decided to waive any right of appeal, except as may be provided herein.

By signing this Plea Agreement, defendant voluntarily waives defendant's right to appeal the Court's Judgment against defendant; and, absent a claim of ineffective assistance of counsel, defendant waives all rights to contest the Judgment in any post-conviction proceeding, including one pursuant to Title 28, United States Code, Section 2255. Defendant reserves only the right to appeal from a sentence that is greater than the upper limit of the Court-determined Sentencing Guidelines range.

Defendant understands that the United States was motivated by defendant's willingness to waive any right of appeal when the United States chose to offer defendant terms of a plea agreement.  In other words, the United States was willing to offer certain terms favorable to defendant in exchange for finality.  Defendant understands and agrees this case will be over once defendant has been sentenced by the Court.  Defendant agrees that it will be a breach of this agreement if defendant appeals in violation of this agreement.  The United States will rely upon defendant's waiver and breach as a basis for dismissal of the appeal.  Moreover, defense counsel may reasonably conclude and inform the appellate court that an appeal is wholly frivolous.  Defense counsel may then move to withdraw, citing Anders v. California, 386 U.S. 738, 744 (1967), and Smith v. Robbins, 528 U.S. 259 (2000).  Defendant agrees an appeal in violation of this agreement should be dismissed.

By signing this Plea Agreement, the defendant further specifically waives defendant's right to seek to withdraw defendant's plea of guilty, pursuant to Federal Rules of Criminal Procedure 11(d), once the plea has been entered in accordance with this agreement.  The appellate court will enforce such waivers.  The defendant agrees that any attempt to withdraw defendant's plea will be denied and any appeal of such denial should be dismissed.

23.   The Assistant United States Attorney and attorney for defendant agree to abide by the provisions of Rule 32(f) of the Federal Rules of Criminal Procedure.  The attorneys acknowledge their obligation to use good-faith efforts to resolve any disputes

regarding the Presentence Investigation Report (PSIR) through a presentence conference or other informal procedures.

24.    Defendant acknowledges reading and understanding all provisions of the Plea Agreement.  Defendant and defendant's attorney have discussed the case and reviewed the Plea Agreement.  They have discussed defendant's constitutional and other rights, including, but not limited to, defendant's plea-statement rights under Rule 410 of the Federal Rules of Evidence and Rule 11(f) of the Federal Rules of Criminal Procedure.

AGREED:

DREW H. WRIGLEY
United States Attorney

Dated: June 7, 2019

By:  JONATHAN J. O'KONEK
Assistant United States Attorney

Dated: May 31, 2019

HUNTER BRIAN HANSON
Defendant

Dated: May 31, 2019

LUCAS WYNNE
Attorney for Defendant

16